## DU PONT v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7173.

Circuit Court of Appeals, Third Circuit.

Feb. 28, 1940.

Percy W. Phillips, of Washington, D. C. (William L. Hennessy, of Wilmington, Del., and Ivins, Phillips, Graves & Barker, of Washington, D. C., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent.

Before BIGGS, CLARK, and JONES, Circuit Judges.

BIGGS, Circuit Judge.

The petitioner was indebted to Bankers Trust Company of New York which called upon him either to deposit additional collateral or reduce the amount of his loan. The petitioner had 90,000 shares of duPont Company stock with Bankers Trust Company as security for this loan. He thereupon made an agreement with Christiana Securities Company to sell to it, and Christiana agreed to buy from the petitioner 62,500 shares of duPont Company stock for $2,000,-000. This agreement was made on April 20, 1932. The petitioner thereupon employed Raymond Ellis to carry out the transaction. Ellis was "a customer's man" employed in the Wilmington office of Laird, Bissell & Meeds, brokers, but he also maintained an office of his own and had a separate clientele. He was accustomed to act as an agent for the petitioner in brokerage transactions and was regularly employed by the petitioner to make up his income tax returns.

Upon April 20, 1932, Ellis wrote to Ross, an employee in the New York office of Laird, Bissell & Meeds, and instructed him to pay Bankers Trust Company for the brokers the sum of $2,000,000 and to receive from Bankers Trust Company 62,500 shares of duPont Company stock belonging to the petitioner and standing in his name. Ellis wrote Ross to put this stock in the name of the brokers and to deliver it to their Wilmington office, stating that " * * * to eliminate any possible chance of being taxed on the sale, we must see to it that none of the Bankers Trust certificates are used in making this delivery."

On April 21, Ellis executed a buy order showing that Laird, Bissell & Meeds purchased 62,500 shares of duPont Company stock from the petitioner for their own account. A short account of the petitioner, known as the "Short No. 2 Account", was thereupon shown as having sold 62,500 shares of duPont Company stock and credited with the sum of $1,999,250, the sum of $750 having been deducted from the amount of the sale price in payment of transfer taxes. At the same time Ellis executed a sell order showing that Laird, Bissell & Meeds had sold 62,500 shares of duPont Company stock to Christiana Securities Company for $2,000,000.

Upon April 21, the New York office of Laird, Bissell & Meeds procured from Bankers Trust Company 62,500 shares of duPont Company stock owned by the petitioner and standing in his name. Bankers Trust Company then billed the brokers for $2,000,000 and payment of this sum was made by the brokers to Bankers Trust Company through the Stock Clearing Corporation as part of the brokers' daily settlement check. The brokers proceeded to take the shares to the duPont Company transfer agent and had new certificates issued in their names. They

thereupon delivered 62,500 shares of duPont Company's stock to J. P. Morgan & Company in New York and received from Morgan & Company the sum of $2,000,000. Of the stock so delivered 40,500 shares were out of the certificates of stock of the petitioner received that day by the brokers in lieu of the certificates of the petitioner delivered by the brokers to the duPont Company transfer agent. Ellis made records showing the receipt of 62,500 shares of duPont Company stock in the "H. F. duPont Special Account",[1] a long account of the petitioner and showing the delivery of 62,500 shares of duPont Company stock by the brokers to Christiana Securities Company.

It will be observed that at this time, viz., April 21, 1932, the records of the brokers showed the petitioner to be short 62,500 shares of duPont Company stock in the duPont "Short No. 2 Account", while at the same time the "H. F. duPont Special Account" showed him to be long 62,500 shares of duPont Company stock.

Upon August 19, 1932, the short position of the petitioner of 62,500 shares of duPont Company stock in his "Short No. 2 Account" and his long position of 62,500 shares in the "H. F. duPont Special Account" were set-off against each other through a third account of the petitioner's known as the "H. F. duPont Account."

The question presented for our determination is whether under the circumstances the petitioner made a short sale of the 62,500 shares of his duPont Company stock held by Bankers Trust Company, within the purview of Section 23(s) of the Revenue Act of 1932.[2] If the petitioner did so, the decision of the Board of Tax Appeals must be affirmed. Otherwise the Board must be reversed, and the petitioner must be held to be entitled to report the gain upon the sale of the stock as a capital gain subject to taxation under Section 101(a) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev. Acts, since the shares were held by him for a period of more than two years.

### The Law.

The Board held that Ellis acting on behalf of the petitioner made a short sale of 62,500 shares against the "box", the box in this instance being 62,500 shares of his 90,000 shares held by Bankers Trust Company when he sold 62,500 shares of duPont Company stock for the brokers' own account; that the sum of these transactions resulted in a short sale within the purview of Section 23(s) of the kind adjudicated by this court in Henry B. DuPont v. Commissioner, 98 F.2d 459.

The petitioner contends that the records and bookkeeping entries executed or caused to be executed by Ellis were fictitious and must be disregarded since they do not reflect actual facts. The petitioner contends that his stock was sold to Laird, Bissell & Meeds by the Bankers Trust Company and was delivered, precluding the possibility of a short sale of those shares of stock.

Was there a short sale in the case at bar? If so, it took place when Ellis sold 62,500 shares of duPont Company stock from the petitioner to the brokers for their own account. At this point the brokers' records showed the petitioner to be short 62,500 shares in the "Short No. 2 Account", he being credited simultaneously with the sum of $1,999,250 in that account. But to bring the case at bar within our ruling in Henry B. DuPont v. Commissioner, supra, 98 F. 2d at page 461, stock, from the petitioner's "box", viz., 62,500 shares of the 90,000

---

[1] Upon April 21, 1932, Laird, Bissell & Meeds sent confirmation notices in the usual form to the petitioner, notifying him that his "Short No. 2 Account" was credited in the sum of $1,999,250 as the proceeds of the sale of 62,500 shares of duPont Company stock and that the "H. F. duPont Special Account" was charged in the sum of $2,000,000 against receipt of 62,500 shares of duPont Company stock. It should be noted that the entries made in the "Short No. 2 Account" are shown under the date of April 22, 1932. See Exhibit F. Those in the "H. F. duPont Special Account" are shown under the date of April 21, 1932. See Exhibit G.

[2] The Revenue Act of 1932, c. 209, 47 Stat. 169, 179, 183, provides:

"Sec. 23. *Deductions from gross income*

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

"(r) *Limitation on Stock Losses.*

\* \* \* \* \* \*

"(s) *Same—Short Sales.* For the purposes of this title, gains or losses (A) from short sales of stocks and bonds, or (B) attributable to privileges or options to buy or sell such stocks and bonds, or (C) from sales or exchanges of such privileges or options, shall be considered as gains or losses from sales or exchanges of stocks or bonds which are not capital assets." 26 U.S.C.A. Int.Rev.Acts.

shares held by Bankers Trust Company, must have been used to close the short transaction. Assuming that there was a short sale, did the petitioner mould the disposition of his long interest into the form and substance of that sale?

It must be borne in mind that the capital gain sought to be taxed as ordinary income amounts to the difference between the price ($1,547,487.12) paid by the petitioner for the 62,500 shares of box stock and the price ($1,999,250) at which 62,500 shares of the duPont Company stock were sold by Ellis to the brokers for their own account. This subtraction will determine the amount subject to tax only if the 62,500 shares of box stock were delivered to the brokers for the benefit of the petitioner, that is to say were put to the credit of "H. F. duPont Special Account", so that such credit could be used to close the short position in the "Short No. 2 Account." The brokers gained possession of the 62,500 shares of the box stock in one of two ways; either they bought the stock for themselves or, acting as agents for the petitioner, they procured it from Bankers Trust Company for his benefit, advancing the necessary funds to effect such a transaction. If the brokers pursued the second course, the entries in the "H. F. duPont Special· Account" of a long position of 62,500 shares with a countervailing debit to the petitioner of $2,000,000 are correct. If, however, Laird, Bissell & Meeds bought from Bankers Trust Company the stock for their own account, the petitioner should have been credited instead of debited with $2,000,000 and the account should not have reflected a long position of 62,500 shares.

One fact that appears with certainty from the letter of April 20, from Ellis to Ross is that Ellis did not desire the petitioner's certificates to be delivered to Wilmington. Ellis was not attempting to avoid taxation of capital gain as ordinary income arising from a short sale. The Revenue Act of 1932 and subsection (s) of Section 23, was not passed until June 6, 1932. The tax that he must have had in mind was the ordinary tax upon capital gains such as that provided for by subsection (c) of Section 111 of the Revenue Act of 1928, 45 Stat. 816, 26 U.S.C.A. Int.Rev.Acts. If the petitioner could go short the exact number of shares of duPont Company stock which he was about to put into a long account, he would be in the advantageous position where he could cover his short position from his long account if the price went up or from the open market if the price went down. If the actual shares

which Bankers Trust Company held were delivered to Christiana Securities Company, their sale would have been consummated and the capital gain thus determined inevitably would be taxable to the petitioner. We think that it was to avoid this tax that Ellis desired to have certificates other than the Bankers Trust Company certificates delivered to the Wilmington office of the brokers and why he created a labyrinth of sales and cross-sales through short and long accounts.

We conclude that the brokers were acting as agents for the petitioner, procuring his own stock for the petitioner and paying on his behalf the sum of $2,000,000, which they themselves advanced. We use the word "procuring" advisedly for it is clear that a person cannot buy his own stock from himself by using an agent. By the means employed the petitioner got a credit for 62,500 shares of stock into the "H. F. duPont Special Account" without establishing a cost for it; that is to say, the cost to the petitioner remained in the sum of $1,-547,487.12. The effect was precisely what it would have been had the petitioner delivered 62,500 shares of stock to the brokers. The accounting record, exhibit "Y", indicates this. The entries made in the "H. F. duPont Special Account" were accurate for the petitioner was actually long 62,500 shares and actually owed the brokers $2,000,000, the sum which they had paid to get the stock. Laird, Bissell & Meeds sold 62,500 shares of duPont Company stock to Morgan & Company for Christiana Securities Company and received the sum of $2,000,000. The brokers thereby fulfilled the petitioner's contract with Christiana Securities Company. This sale is evidenced with substantial accuracy by the sales Slip, Exhibit "X", executed by Ellis.

To return now to the original question, Was the sale made by Ellis from the petitioner of 62,500 shares to the brokers for their own account an actual short sale? We think that the petitioner's agent, Ellis, who executed the sales slip, Exhibit "W", must have intended to effect the result evidenced by the sales slip. An agent, as well as a principal, must be deemed to have intended the reasonable consequences of his act. We conclude, therefore, that Ellis intended the petitioner to be short 62,500 shares of duPont Company stock and that this particular transaction of the agent created a debt due from his principal in terms of stock. H. B. DuPont v. Commissioner, supra, 98 F. 2d at page 461.

644

On August 19, 1932, as we have already stated, the petitioner's position in the short account was cleared against his position in the long account precisely as was done in the case of H. B. DuPont v. Commissioner, supra. Our decision in that case rules the case at bar.

The adjustment of the dividend of 75 cents a share paid upon June 15, 1932 by the duPont Company to stockholders of record upon May 25, 1932, requires no special consideration. It follows our ruling upon the principal issue.

In arriving at the conclusions expressed in the case at bar we have endeavored to give effect to the records in evidence. We think that no justification can be found for treating them as fictitious. We believe they came into being as a result of a well defined plan which the petitioner's agent, Ellis, carried out substantially as he had planned. In carrying out this plan the petitioner did not sell 62,500 shares of the duPont Company stock held by Bankers Trust Company to Christiana Securities Company. For this reason, the contentions of the petitioner must fail.

The decision of the Board is affirmed.